UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JONATHAN DASHO,

                Plaintiff,

        v.

CITY OF FEDERAL WAY, et al.,

                Defendants.

CASE NO. C12-1398JLR

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## I.   INTRODUCTION

Before the court is Defendants City of Federal Way ("Federal Way"), Officer

Kelly Smith, and Officer Steven Wortman's motion for summary judgment on all of

Plaintiff Jonathan Dasho's claims.  (Mot. (Dkt. # 44).)  Mr. Dasho asserts claims under

42 U.S.C. § 1983 for excessive force.  (*See generally* Compl. (Dkt. # 1).)  Defendants'

motion counters that Officers Smith and Wortman ("the Officers") are entitled to

qualified immunity and that Mr. Dasho lacks evidence to support his claims against

Federal Way.  (*See generally* Mot.)  The court has considered the motion, all submissions

1  filed in support of and opposition thereto, the balance of the record, and the relevant law

2  and held oral argument on June 12, 2015.  Being fully advised, the court GRANTS

3  Defendants' motion and dismisses Mr. Dasho's claims with prejudice.

## II.   BACKGROUND

5      The following facts are undisputed unless otherwise noted:  On the evening of

6  August 19, 2009, Federal Way Police Officers Smith and Wortman responded to a call

7  about a domestic disturbance outside Mr. Dasho's apartment.  *State v. Dasho*, 171 Wash.

8  App. 1030, at *1 (Wash. Ct. App. 2012).[1]  That day was the birthday of Mr. Dasho's

9  older brother, Jared Dasho ("Jared"), and Jared had come over to Mr. Dasho's apartment

10  in the afternoon to celebrate.  *Id.*; (Miller Decl. (Dkt. # 45) ¶ 3 Ex. A ("Jared Dep.") at

11  15:17-16:11.)  The brothers marked the occasion by drinking a substantial amount of

12  vodka.  *Dasho*, 171 Wash. App. at *1; (*see also* Jared Dep. at 16:12-19, 21:15-20; 22:5-9;

13  Miller Decl. ¶ 4 Ex. B ("Breen Dep.") at 20:2-7, 21:16-22:1.)  Mr. Dasho's girlfriend,

14  Emily Breen, was also present but drank only a small amount.  (Breen Dep. at 20:8-11.)

15  As the evening progressed, Mr. Dasho and Jared became heavily intoxicated.  *Dasho* 171

16  Wash. App. at *1; (*see also* Breen Dep. at 21:16-17; Jared Dep. 22:13-23:9.)

17      The disturbance that brought the officers was a fistfight between Mr. Dasho and

18  Jared that took place on the sidewalk in front of Mr. Dasho's apartment.  *See Dasho*, 171

---

20  [1] In laying out what occurred on August 19, 2009, the court cites extensively to the
21  Washington Court of Appeals' opinion in Mr. Dasho's criminal case, *State v. Dasho*, 171 Wash.
App. 1030 (Wash. Ct. App. 2012).  Mr. Dasho has expressly adopted its account of what
occurred that night (Resp. (Dkt. # 55) at 2 ("The Court of Appeals Opinion . . . objectively sets
22  forth the facts as follows . . . .")), and the facts cited from the court of appeals' opinion are
consistent with Defendants' version of events.

Wash. App. at *1; (Wortman Decl. (Dkt. # 46) ¶ 3 Ex. B ("Wortman Report") at 1.)  Mr. Dasho struck Jared in the head, causing Jared to apparently lose consciousness, fall to the ground, and hit his head on the pavement.  (Breen Dep. 23:23-24:3, 32:5-34:3.)  Following the fight, Mr. Dasho, Jared, and Ms. Breen made their way back into the apartment.  *See Dasho*, 171 Wash. App. at *1; (Breen Dep. at 35:1-24.)  Neighbors observed the fight and reported it to the police.  *Dasho*, 171 Wash. App. at *1; (*see also* Wortman Report at 1; Smith Decl. (Dkt. # 47) ¶ 3 Ex. B ("Smith Report") at 1.)

Officers Smith and Wortman arrived at Mr. Dasho's apartment complex around 9:30 p.m. and approached Mr. Dasho's apartment.  (Smith Report at 1; Wortman Report at 1); *see also Dasho*, 171 Wash. App. at *1.  They noticed a small pool of blood on the landing as they made their way to the door.  (Wortman Report at 1; Smith Report at 1.)  The Officers looked into a window near the door but could see no one in the apartment.  (Wortman Report at 1; Smith Report at 2.)  They knocked, announced their presence, and demanded to be let in but initially no one responded.  (*See* Wortman Report at 1; Smith Report at 2.)  Officer Smith then went back to the window whereupon he noticed a naked male, Mr. Dasho, lying on his side on the floor.  (Smith Report at 2; Wortman Report at 1-2.)

Shortly thereafter, Jared let the Officers into the apartment.  *Dasho*, 171 Wash. App. at *1; (*see also* Wortman Report at 2; Smith Report at 2; Jared Dep. at 31:17-22.)  Upon entering, the Officers found themselves on one side of the living room.  (*See* Wortman Report at 1.)  The living room was small, with entrances to the hallway and kitchen in the corner opposite to where the Officers were standing and to their right as

1   they looked across the room.  (*See* Noedel Decl. (Dkt. # 48) ¶ 3 Ex. B ("Noedel Report")

2   at 6, 8.)  Ms. Breen was at the other end of the living room, to the left of the Officers, and

3   Jared was near the Officers.  (*See id.* at 8; Wortman Report at 2; Breen Dep. at 49:5-7,

4   49:21-50:1.)  Mr. Dasho, who had been lying on the living room floor, jumped up and ran

5   into the kitchen.  *Dasho*, 171 Wash. App. at *1; (Breen Dep. at 50:7-51:19; Wortman

6   Report at 1.)

7        Officer Wortman ordered Mr. Dasho to stop, but Mr. Dasho ignored that

8   command and began rummaging in a kitchen drawer.  (Wortman Report at 2; Breen Dep.

9   at 51:18-53:4.)  Officer Wortman repeated the command several more times; however,

10  Mr. Dasho continued to ignore him.  (Wortman Report at 2.)  The Officers began to fear

11  that Mr. Dasho might be attempting to arm himself.  (Wortman Report at 2; *see also*

12  Smith Report at 2.)  They drew their guns.  (*See* Wortman Report at 2; Smith Report at 2;

13  Breen Dep. at 55:2-18.)  Mr. Dasho grabbed a table knife from the drawer, came back out

14  of the kitchen at a rapid pace, and ran toward the Officers while raising the knife over his

15  head.  *Dasho*, 171 Wash. App. at *1; (*see also* Wortman Report at 2; Smith Report at 2;

16  Breen Dep. at 53:5-54:17.)  At that point, Mr. Dasho was roughly five to ten feet away

17  from the Officers.  (*See* Noedel Report at 6, 8-9.)

18       The Officers shouted at Mr. Dasho to stop, but he again ignored them.  *See Dasho*,

19  171 Wash. App. at *1; (Breen Dep. at 54:18-23.)  Both Officers then fired their handguns

20  at Mr. Dasho.  (Wortman Report at 2; Smith Report at 2.)  Officer Wortman fired seven

21  times, and Officer Smith fired six times.  (Noedel Report at 6-7.)  In all, eleven of the

22  thirteen bullets struck Mr. Dasho.  (*Id.*)  The shooting lasted no more than three

1  seconds—Ms. Breen estimates that it lasted only one-and-a-half seconds (*see* Breen Dep.

2  at 59:4-10; Noedel Report at 7)—and only around 10 seconds passed from the time the

3  Officers entered the apartment to the end of the shooting (Breen Dep. at 49:11-20).

4       The Officers did not administer medical aid to Mr. Dasho immediately after the

5  shooting.  (*See* Wortman Report at 2-3; Smith Report at 2-3.)  Officer Smith explains that

6  he did not believe it was safe to do so because there were only two officers at the scene,

7  other people were in the apartment, the knife had fallen near where Mr. Dasho came to

8  rest, and the Officers did not know if anyone was hiding in the unseen parts of the

9  apartment.  (*See* Smith Report at 3.)  The Officers did, however, promptly call for

10  medical help.  (*See* Staskiewicz Decl. (Dkt. # 49) ¶ 3 Ex. B ("Staskiewicz Report") at 15

11  (noting that only 54 seconds elapsed from the Officers' report of contact with the

12  occupants of the apartment and their report of the shooting and request for medical

13  assistance); *see also* Wortman Report at 3.)  That help, along with additional officers,

14  arrived in under four minutes (Staskiewicz Report at 15), after which Officers Smith and

15  Wortman departed the scene (Wortman Report at 3; Smith Report at 3).

16       Following the events of August 19, 2009, the State of Washington charged Mr.

17  Dasho with two counts of assaulting a police officer and two counts of assault with a

18  deadly weapon.  (Miller Decl. ¶ 12 Ex. J (amended information).)  The case went to trial,

19  and the jury convicted Mr. Dasho of the first two counts but acquitted him of the latter

20  two.  *See Dasho*, 171 Wash. App. at *2.  Mr. Dasho appealed his conviction on several

21  grounds, but the Washington Court of Appeals denied his appeal.  *Id.* at *1.

22

1    In August 2012, Mr. Dasho filed this action under 42 U.S.C. § 1983 alleging that

2    Officers Smith and Wortman violated his Fourth and Fourteenth Amendment rights by

3    using excessive force against him.  (*See* Compl. at 1, ¶¶ 1.1, 6.1.)  Mr. Dasho's complaint

4    also contains a cause of action against Federal Way, which he asserts caused the violation

5    of his rights through its policies and customs and by ratifying the Officers' conduct.  (*See*

6    *id.* ¶¶ 4.13, 4.19, 6.2.)  Defendants now bring a motion for summary judgment against all

7    of Mr. Dasho's claims.  (*See* Mot. at 1, 24.)  Defendants argue that Officers Smith and

8    Wortman have qualified immunity on Mr. Dasho's claims against them, and that Mr.

9    Dasho's claims against Federal Way lack evidentiary support.  (*See* Mot. at 8.)

10   Defendants' motion is now before the court.

11                                  **III.    DISCUSSION**

12   **A.    Summary Judgment Standard**

13        Summary judgment is appropriate if the evidence, when viewed in the light most

14   favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to

15   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

16   P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*,

17   477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

18   there is no genuine issue of material fact and that he or she is entitled to prevail as a

19   matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden,

20   then the nonmoving party "must make a showing sufficient to establish a genuine dispute

21   of material fact regarding the existence of the essential elements of his case that he must

22   prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658.

1    In determining whether the fact-finder could reasonably find in the nonmoving

2   party's favor, "the court must draw all reasonable inferences in favor of the nonmoving

3   party, and it may not make credibility determinations or weigh the evidence." *Reeves v.*

4   *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Nevertheless, the

5   nonmoving party "must do more than simply show that there is some metaphysical doubt

6   as to the material facts . . . . Where the record taken as a whole could not lead a rational

7   trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v.*

8   *Harris*, 550  U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting *Matsushita*

9   *Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  The court may

10  only consider admissible evidence when ruling on a motion for summary judgment.  O*rr*

11  *v. Bank of Am., NT & SA*, 285 F.3d 764, 773-75 (9th Cir. 2002).

12  **B.     Qualified Immunity**

13     In the context of 42 U.S.C. § 1983 claims, "[t]he doctrine of qualified immunity

14  protects government officials 'from liability for civil damages insofar as their conduct

15  does not violate clearly established statutory or constitutional rights of which a

16  reasonable person would have known.'"  *Stanton v. Sims,* --- U.S. ---, 134 S.Ct. 3, 4-5

17  (2013) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

18  "Qualified immunity gives government officials breathing room to make reasonable but

19  mistaken judgments," and "protects all but the plainly incompetent or those who

20  knowingly violate the law." *Ashcroft v. al-Kidd*, --- U.S. ---, 131 S. Ct. 2074, 2085 (2011)

21  (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Accordingly, an officer will be

22  denied qualified immunity in a § 1983 action "'only if (1) the facts alleged, taken in the

1   light most favorable to the party asserting injury, show that the officer's conduct violated

2   a constitutional right, and (2) the right at issue was clearly established at the time of the

3   incident such that a reasonable officer would have understood her conduct to be unlawful

4   in that situation.'" *Green v. City & Cnty. of San Fran.*, 751 F.3d. 1039, 1051-52 (9th Cir.

5   2014) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)).

6   **C.    Excessive Force**

7          In evaluating a Fourth Amendment claim of excessive force, courts ask "whether

8   the officers' actions are 'objectively reasonable' in light of the facts and circumstances

9   confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989).  This inquiry "requires

10  a careful balancing of the nature and quality of the intrusion on the individual's Fourth

11  Amendment interests against the countervailing governmental interests at stake." *Id.* at

12  396.  "The calculus of reasonableness must embody allowance for the fact that police

13  officers are often forced to make split-second judgments—in circumstances that are

14  tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

15  particular situation." *Id.* at 396-97.  As such, reasonableness is evaluated "from the

16  perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

17  hindsight." *Glenn v. Wash. Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (citing *Graham*, 490

18  U.S. at 397).  Police officers "need not avail themselves of the least intrusive means of

19  responding"; rather, they need only act "within that range of conduct [identified] as

20  reasonable." *Billington v. Smith*, 292 F.3d 1177, 1188-89 (9th Cir. 2002).

21         The excessive force analysis involves three steps.  First, a court must "assess the

22  severity of the intrusion on the individual's Fourth Amendment rights by evaluating the

type and amount of force inflicted." *Glenn*, 673 F.3d at 871.  Second, a court must

"evaluate the government's interest in the use of force." *Id.*  At a minimum, three factors

inform the government's interest:  "(1) how severe the crime at issue is, (2) whether the

suspect posed an immediate threat to the safety of the officers or others, and (3) whether

the suspect was actively resisting arrest or attempting to evade arrest by flight." *Lal v.*

*California*, 746 F.3d 1112, 1117 (9th Cir. 2014); *see also Mattos v. Agarano*, 661 F.3d

433, 441 (9th Cir. 2011) (noting that these factors are not exclusive and that courts

consider "whatever specific factors may be appropriate in a particular case").  Of these

the most important is whether the suspect posed an immediate threat to the safety of the

officers or others.  *Lal*, 746 F.3d at 1117; *see also Glenn*, 673 F.3d at 872.  Finally, a

court must "balance the gravity of the intrusion on the individual against the

government's need for that intrusion." *Id.*

Because the excessive force inquiry ordinarily "requires a jury to sift through

disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has

emphasized that "summary judgment . . . in excessive force cases should be granted

sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc).

However, the Supreme Court has made clear that, at the summary judgment stage, once a

court has determined the relevant set of facts and drawn all inferences in favor of the

nonmoving party, the reasonableness of an officer's actions remains a question of law for

the court to decide.  *Scott*, 550 U.S. at 381 n.8; *see also Gonzalez v. City of Anaheim*, 747

F.3d 789, 801 (9th Cir. 2014) (J. Trott, Kozinski, Tallman, and Bea, *dissenting*).

1    In this case, Mr. Dasho asserts that Officers Smith and Wortman used excessive

2    force against him in two respects—by shooting him and by failing to promptly render

3    medical care.  (*See* Compl.; Resp. at 5-10.)  Officers Smith and Wortman move for

4    summary judgment on Mr. Dasho's excessive force claims, arguing that they are entitled

5    to qualified immunity.  (*See* Mot. at 8-17.)  As such, the court must determine (1)

6    whether the Officers used force that was objectively reasonable in light of the facts and

7    circumstances confronting them, *see Graham*, 490 U.S. at 397; *Green*, 751 F.3d at 1051-

8    52, and (2) if not, whether their use of force was clearly unreasonable in light of the law

9    as it then existed, *see Green*, 751 F.3d at 1051-52.  In answering these questions, the

10   court must view the facts in the light most favorable to Mr. Dasho and draw all

11   reasonable inferences in his favor.  *See Reeves*, 530 U.S. at 150; *see also Scott*, 550 U.S.

12   at 381 n.8.

13       1.  <u>The Shooting</u>

14           *a.  Relevant facts & Defendants' motion to strike*

15   Before proceeding to the excessive force analysis with respect to the shooting, the

16   court first establishes the relevant facts, drawing all inferences in favor of Mr. Dasho.

17   *See Scott*, 550 U.S. at 381 n.8.  As discussed in greater detail above, *see supra* Part II, the

18   following facts are undisputed:  The Officers responded to a report of a fight at Mr.

19   Dasho's apartment.  After the Officers entered the apartment, Mr. Dasho, who was naked,

20   ran into the kitchen where he grabbed a table knife from a drawer.  Officer Wortman

21   ordered Mr. Dasho to stop, but Mr. Dasho ignored that command.  Mr. Dasho then

22   entered the living room at a rapid pace, ignoring continued commands to stop, and ran

1   toward the Officers while raising the knife over his head.  The Officers fired their guns

2   thirteen times in the space of 1.5 to 3 seconds, hitting Mr. Dasho 11 times.  These events

3   occurred in close quarters and within a short period of time.

4          The parties' only factual disagreement relates to what Mr. Dasho and the Officers

5   did in the moments just before and just after the shooting began.  The Officers maintain

6   that Mr. Dasho charged directly at them without turning.  (Wortman Decl. ¶ 5; Smith

7   Decl. ¶ 5.)  They admit that they continued to shoot Mr. Dasho as he fell to the ground

8   but contend that Mr. Dasho was still moving toward them as he fell and that they stopped

9   firing when he hit the ground.  (*See* Wortman Decl. ¶ 6; Miller Decl ¶ 6 Ex. D

10   ("Wortman Testimony") at 55:2-56:2, 57:16-24; Smith Decl. ¶ 6; Smith Report at 2;

11   Miller Decl. ¶ 7 Ex. E ("Smith Testimony") at 91:1-10, 94:16-95:11, 95:18-96:12.)  In

12   support of their position on this issue, the Officers offer their own sworn declarations (*see*

13   Wortman Decl. ¶¶ 5-6; Smith Decl. ¶¶ 5-6; Wortman Report at 2; Smith Report at 2),

14   their testimony from Mr. Dasho's criminal trial (*see* Wortman Testimony at 55-57; Smith

15   Testimony at 91, 94-96), and Ms. Breen's deposition testimony (*see* Breen Dep. at 53-54,

16   58-60).  Ms. Breen's account of events is consistent with the Officers' testimony.  (*See*

17   *id.*)

18          Mr. Dasho disagrees with the Officers.  He argues that he turned away from the

19   Officers before the shooting started.  (*See* Resp. at 4, 7-8.)  He also argues that the

20   Officers continued shooting him after he "fell to the ground and was immobilized."

21   (Resp. at 7; *see also id.* at 4, 8, 11.)  Yet neither Mr. Dasho nor Jared remembers what

22   occurred between Mr. Dasho and the Officers.  (*See* Miller Decl. ¶ 5 Ex. C ("Dasho

1   Dep.") at 82:20-83:1, 85:2-86:22; Jared Dep. at 35:25-38:13.)  As such, Mr. Dasho's only

2   evidence to support his version of events comes from his forensics expert, Kay Sweeney.

3   (*See* Resp.)  Defendants move to strike this evidence.  (*See* Reply (Dkt. # 57) at 2-3.)

4          Most of Mr. Dasho's evidence is inadmissible and must be stricken.  *See Orr*, 285

5   F.3d at 773 ("A trial court can only consider admissible evidence in ruling on a motion

6   for summary judgment.").  The court has already ruled that many of Mr. Sweeney's

7   opinions are inadmissible because they are unreliable.  (*See* 4/27/15 Order (Dkt. # 64).)

8   Even to the extent Mr. Sweeney's opinions survived the court's prior order, however, Mr.

9   Dasho has not offered most of those opinions in an admissible form.  Mr. Dasho offers

10  only Mr. Sweeney's report, which is unsworn, and five pages of the transcript of Mr.

11  Sweeney's testimony at Mr. Dasho's criminal trial.  (*See* Lohraff Decl. (Dkt. # 56) ¶ 3

12  Ex. 1 ("Sweeney Report"), ¶ 4 Ex. 2 ("Sweeney Testimony").)

13         The court does not consider Mr. Sweeney's unsworn report in ruling on

14  Defendants' motion.  "[C]ourts in this circuit have routinely held that unsworn expert

15  reports are inadmissible" and may not be considered as summary judgment evidence.

16  *Harris v. Extendicare Homes, Inc.*, 829 F. Supp. 2d 1023, 1027 (W.D. Wash. 2011)

17  (citing *Aecon Bldgs., Inc. v. Zurich N. Am.*, 572 F. Supp. 2d 1227, 1237 (W.D. Wash.

18  2008); *Shuffle Master, Inc. v. MP Games LLC*, 553 F. Supp. 2d 1202, 1210-11 (D. Nev.

19  2008) (collecting cases)); *see also* Fed. R. Civ. P. 56(c).  Accordingly, the court grants

20  Defendants' motion as to Mr. Sweeney's report and strikes that document (Dkt. # 56-1).

21         Defendants also move to strike the excerpts from Mr. Sweeney's trial testimony.

22  (Reply at 2-3.)  They argue that the testimony lacks foundation because it fails to show

ORDER- 12

1   Mr. Sweeney's qualifications to testify as an expert, the methods he used to reach his

2   conclusions, or the materials he reviewed.  (*See id.*)  The court rejects this argument.  In

3   ruling on Defendants' motions to exclude Mr. Sweeney's testimony, the court has

4   become quite familiar with Mr. Sweeney's opinions in this case, his qualifications, and

5   his testimony at Mr. Dasho's criminal trial.  (*See, e.g.*, 4/27/15 Order; 11/4/14 Order

6   (Dkt. # 58).)  Indeed, the court has already held, without objection from Defendants, that

7   Mr. Sweeney is qualified to testify as an expert on forensic science.  (4/27/15 Order at 8-

8   9.)  Moreover, the court has reviewed the bulk of Mr. Sweeney's former trial testimony,

9   which Mr. Dasho submitted in connection with Defendants' motions to exclude and

10  which describes Mr. Sweeney's qualifications, methods, and analysis of the evidence in

11  this case.  (*See* Dkt. ## 61-1 – 6-3.)  The court finds that the record adequately establishes

12  a foundation for the excerpts of Mr. Sweeney's former testimony at issue here and

13  therefore denies this aspect of Defendants' motion to strike.  (*See id.*; *see also* 4/27/15

14  Order.)

15        Nevertheless, without Mr. Sweeney's report, Mr. Dasho relies on just five pages of

16  Mr. Sweeney's former trial testimony as evidence to oppose summary judgment.  (*See*

17  Sweeny Testimony (Dkt. # 56-2).)  In those pages, Mr. Sweeney opines that Mr. Dasho

18  did not receive any wounds "directly face on" (*id.* at 82), was along the east wall when he

19  was shot (*id.*), and ended up falling face down near the entrance to the kitchen (*id.* at 141-

20  42).  Mr. Sweeney also notes that he recovered a bullet from the floor near where Mr.

21  Dasho fell and that this bullet did not go through Mr. Dasho.  (*Id.* at 144-45.)

22

1        This evidence provides scant support for Mr. Dasho's version of events.  Even

2   drawing all inferences in favor of Mr. Dasho, no rational jury could conclude that

3   Officers Smith and Wortman continued to shoot Mr. Dasho after he "fell to the ground

4   and was immobilized."  (Resp. at 7; *see also id.* at 4, 8, 11.)  Officers Smith and Wortman

5   both testify that they stopped shooting at Mr. Dasho after he fell to the ground.  (Smith

6   Decl. ¶ 6; Wortman Decl. ¶ 6.)  Although the court may not simply accept the testimony

7   of defendant-officers if their testimony is internally inconsistent or inconsistent with

8   other evidence in the record, *see Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir.

9   2014); *Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1169-70 (9th Cir. 1996), *overruled*

10  *on other grounds by Acri v. Varian Associates, Inc.*, 114 F.3d 999 (9th Cir. 1997); *Scott*

11  *v. Heinrich*, 39 F.3d 912, 915 (9th Cir. 1994), no such inconsistency exists here.  The

12  Officers' testimony displays no internal inconsistency, and Ms. Breen, who was Mr.

13  Dasho's girlfriend and is the only other eyewitness who remembers what occurred,

14  corroborates the Officers' testimony.[2]  (*See* Breen Dep. at 59:20-22); *see also Reynolds*,

15  84 F.3d at 1069-70 (noting that two independent eyewitnesses corroborated the

16  defendant-officer's version of events).

17        Nor does the physical evidence or any expert testimony contradict the Officers'

18  testimony that they did not shoot Mr. Dasho after he lay immobilized on the ground.

19  ―――――――――――

20      [2] At oral argument, Mr. Dasho's counsel characterized Ms. Breen as a neutral witness but
    stated that Ms. Breen did not testify as to whether the Officers continued to shoot at Mr. Dasho
21  after he fell to the floor.  The latter aspect of counsel's statement is inaccurate.  Ms. Breen
    testified at her deposition that the Officers did not shoot at Mr. Dasho after he fell to the ground.
22  (Breen Dep. at 59:20-22 ("Q:  Did the officer fire any shots at Jonathan once he was down on the
    floor?  A:  No.").)

1    Indeed, even Mr. Sweeney, Mr. Dasho's only source of evidence, does not interpret the

2    physical evidence in the manner suggested by Mr. Dasho.[3]  Rather Mr. Sweeney opines

3    only that Mr. Dasho had his side turned to the Officers during the shooting, and that the

4    Officers shot at Mr. Dasho as he fell to the floor.  (*See, e.g.*, Dkt. # 61-2 at 52-62.)  At

5    most, therefore, a reasonable jury could conclude that Mr. Dasho turned away from the

6    Officers just before or during the shooting, and that the Officers continued to shoot at Mr.

7    Dasho as he fell to the floor.

8         Having established the relevant set of facts and drawn all reasonable inferences in

9    Mr. Dasho's favor, the court turns to its attention to whether Officers Smith and Wortman

10   have qualified immunity against Mr. Dasho's excessive force claims.

11              *b.  Constitutional violation*

12        The court begins its qualified immunity analysis with the question of whether

13   Officers Smith and Wortman used excessive force against Mr. Dasho.  *See Graham*, 490

14   U.S. at 397; *Green*, 751 F.3d at 1051-52.  In answering that question, the court first

15   assesses the severity of the intrusion on Mr. Dasho's Fourth Amendment interests by

16   evaluating the type and amount of force inflicted.  *See Glenn*, 673 F.3d at 871.  Officers

17   Smith and Wortman fired their handguns at Mr. Dasho, which constitutes a use of deadly

18   force.  *See Tennessee v. Garner*, 471 U.S. 1, 4 (1985).  Deadly force is constitutionally

19   permissible only where "the officer has probable cause to believe that the suspect poses a

20

21        [3] Mr. Dasho's counsel confirmed at oral argument that Mr. Dasho relies heavily on Mr.

22   Sweeney to support the argument that the Officers continued to shoot Mr. Dasho after Mr. Dasho
     fell to the floor.

threat of serious physical harm, either to the officer or to others," such as "if the suspect

threatens the officer with a weapon." *Id.* at 11-12.  In addition, the Officers employed a

substantial amount of force, firing at Mr. Dasho 13 times and hitting him 11 times,

although they applied that force within a short period of time—between 1.5 and 3

seconds.  (*See* Noedel Report at 6-7; Breen Dep. at 59:4-10.)

Next, the court turns to the Government's interest in the use of force.  *See Glenn*,

673 F.3d at 871.  The key consideration here is whether Mr. Dasho posed an immediate

threat to the safety of the Officers or others.  *See id.* at 872; *Lal*, 746 F.3d at 441.  Mr.

Dasho was a muscular individual at the time of shooting.  (Wortman Decl. ¶ 5; Smith

Decl. ¶ 5; *see also* Breen Dep. at 60:6-22.)  He ignored police commands to stop and

instead grabbed a table knife from the kitchen, moved quickly out into the living room,

and ran toward the Officers, placing himself in close proximity to the Officers, Jared, and

Ms. Breen.  *See Dasho*, 171 Wash. App. at *1; (Wortman Report at 2; Smith Report at 2;

Breen Dep. at 51:18-54:17; Noedel Report at 6, 8-9.)  As he entered the living room and

advanced toward the Officers, he raised the knife over his head.  *See Dasho*, 171 Wash.

App. at *1; (*see also* Wortman Report at 2; Smith Report at 2; Breen Dep. at 53:5-54:17.)

This conduct made Mr. Dasho an immediate threat to the safety of the Officers as well as

Ms. Breen and Jared.  *Cf. Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1116-18 (9th

Cir. 2005) (finding reasonable deputies' conclusion that the suspect posed a threat of

serious physical harm where the suspect was armed with a sword, had not responded to

orders to stop and give up his weapon, and was trying to get inside a private resident

where others might be in danger); *Reynolds*, 84 F.3d at 1168 (finding that suspect who

1    behaved erratically and swung a knife at the defendant-officer "threatened [the officer's]

2    life or at least put him in fear of great bodily injury").

3          That Mr. Dasho may have turned his side to the Officers does not alter this

4    conclusion.  (*See* Sweeney Testimony at 82.)  To begin, any turns may have been

5    contortions made while Mr. Dasho advanced on the Officers.  If that was the case, the

6    threat did not decrease as a result.  Moreover, even if turns amounted to changes of

7    direction, Mr. Dasho remained an immediate threat to the physical safety of those in the

8    apartment.  (*See* Wortman Decl. ¶ 5; Smith Decl. ¶ 5.)  In reaching this conclusion, the

9    court is mindful that although on summary judgment it must view the facts in the light

10   most favorable to Mr. Dasho, the excessive force inquiry demands that the court also

11   view the facts from the perspective of a reasonable officer in the shoes of Officers Smith

12   and Wortman.  *See Torres v. Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).  Thus, the

13   court must consider whether, from Officers Smith and Wortman's perspective, a

14   reasonable officer would have viewed Mr. Dasho's actions, including any turns or

15   changes of direction, as an immediate threat to the safety of those in the apartment.  *See*

16   *id.*

17         The court has no trouble answering that question in the affirmative.  Once the

18   Officers entered the apartment, events unfolded rapidly.  Mr. Dasho behaved erratically,

19   ignored police commands, and assaulted the Officers.  *See Dasho*, 171 Wash. App. at *1,

20   4 (noting that Mr. Dasho could have committed assault either by placing the Officers in

21   reasonable apprehension of bodily harm or by attempting to inflict bodily harm on them

22   while having the apparent present ability to do so); (Wortman Report at 2; Smith Report

1    at 2; Breen Dep. at 51:18-54:17.)  A reasonable officer would not perceive Mr. Dasho's

2    turning away as removing the threat to those in the apartment.  Mr. Dasho could have

3    been attempting to attack Ms. Breen, who was also in the living room.  (*See* Smith Report

4    at 2.)  He also could have retreated to another part of the apartment and attacked someone

5    else—the Officers did not know whether anyone else was in another part of the

6    apartment.  *See Blanford*, 406 F.3d 1116-18; (Wortman Report at 3; Smith Report at 3.)

7    Finally, the living room was small, Mr. Dasho was already within a few feet of the

8    Officers, and he could have quickly resumed his advance on them.  (*See* Noedel Report at

9    6, 8-9; Wortman Decl. ¶ 5; Smith Decl. ¶ 5.)  Given the situation confronting the

10    Officers, a reasonable officer could have concluded that Mr. Dasho posed an immediate

11    threat to the safety of those in the apartment even if he turned or changed directions.  *See*

12    *Torres*, 648 F.3d at 1124; *Blanford*, 406 F.3d 1116-18.

13        Also relevant to the Government's interest are the severity of the crime at issue

14    and whether Mr. Dasho was actively attempting to resist or evade arrest.  *Lal*, 746 F.3d at

15    441; *Glenn*, 673 F.3d at 871.  Officers Smith and Wortman had responded to a call about

16    a fight, been directed to Mr. Dasho's apartment, and observed a pool of blood outside Mr.

17    Dasho's apartment.  *See Dasho*, 171 Wash. App. at *1; (Wortman Report at 1; Smith

18    Report at 1.)  Thus, Mr. Dasho was likely suspected of being involved in a battery in

19    which someone might have been injured.  (*See* Wortman Report at 1.)  Furthermore,

20    when he advanced on the Officers with a knife raised over his head, Mr. Dasho

21    committed assault against police officers, *Dasho*, 171 Wash. App. at *1, a serious

22    offense, *see Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir.

1    2015) (characterizing "assaulting a police officer with a deadly weapon" as a "serious

2    crime"); *Caldwell v. City of Selma*, No. 1:13-cv-00465- SAB, 2014 WL 4275513, at *8

3    (C.D. Cal. Aug. 19, 2014) (finding that "assault and battery on a police officer" are

4    relatively severe crimes that "weigh[] in favor of the use [deadly] of force").  In addition,

5    Mr. Dasho was actively resisting arrest as he ignored repeated commands to stop and

6    instead moved aggressively toward the Officers.  *See Dasho*, 171 Wash. App. at *1; (*see*

7    *also* Wortman Report at 2; Smith Report at 2; Breen Dep. at 53:5-54:23.)

8            Finally, the court weighs the government's interest in the use of force against the

9    intrusion on Mr. Dasho's Fourth Amendment rights to determine whether the use of force

10   was reasonable under the circumstances.  *See Glenn*, 673 F.3d at 871.  The court finds

11   that Officers Smith and Wortman acted reasonably and therefore did not violate Mr.

12   Dasho's Fourth Amendment rights.  Deadly force is reasonable where "the officer has

13   probable cause to believe that the suspect poses a threat of serious physical harm, either

14   to the officer or to others," such as "if the suspect threatens the officer with a weapon."

15   *Garner*, 471 U.S. at 11-12; *see also Smith*, 394 F.3d at 704 ("[W]here a suspect threatens

16   an officer with a weapon such as a gun or a knife, the officer is justified in using deadly

17   force.").  As described above, Officers Smith and Wortman had probable cause to believe

18   that Mr. Dasho posed a serious threat of physical harm to them, to Jared and Ms. Breen,

19   and to anyone else who might have been in the apartment.

20           Furthermore, the Officers acted reasonably in continuing to use deadly force

21   against Mr. Dasho as he fell.  "[I]f police officers are justified in firing at a suspect in

22   order to end a severe threat to public safety, the officers need not stop shooting until the

1   threat has ended." *Plumhoff v. Rickard*, --- U.S. ---, 134 S. Ct. 2012, 2022 (2014).

2   Moreover, when faced with a tense, uncertain, rapidly evolving, and dangerous situation

3   such as the one that existed here, an officer may reasonably fire a volley of shots at a

4   threatening suspect, even if some of those shots are fired as the suspect falls to or lies on

5   the ground.  *See Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) (quoted and cited with

6   approval in *Sheehan v. City & Cnty. of San Fran.*, 743 F.3d 1211, 1230 (9th Cir. 2014),

7   *rev'd in part on other grounds*, --- U.S. ---, 135 S. Ct. 1765 (2015)) ("It may well be true

8   that Conley continued to fire as Berube fell to or lay on the ground.  But it is clear from

9   the very brief time that elapsed that she made a split-second judgment in responding to an

10  imminent threat [of a man charging at her with a hammer] and fired a fusillade in an

11  emergency situation.  Conley's actions cannot be found unreasonable because she may

12  have failed to perfectly calibrate the amount of force required to protect herself."); *see*

13  *also Sheehan*, 135 S. Ct. at 1775 ("Nothing in the Fourth Amendment barred Reynolds

14  and Holder from protecting themselves, even though they fired multiple rounds.") (citing

15  *Plumhoff*, 134 S. Ct. at 2020).  Here, the Officers fired a 1.5 to 3 second volley at a fast-

16  moving, muscular man who had ignored their commands and advanced on them with a

17  knife raised over his head.  *See Dasho*, 171 Wash. App. at *1; (Wortman Report at 2;

18  Smith Report at 2; Wortman Decl. ¶ 5; Smith Decl. ¶ 5; Breen Dep. at 51:18-54:23;

19  Noedel Report at 6, 8-9.)  Even if one might regret their failure to stop shooting at Mr.

20  Dasho as he went down, they acted reasonably in the circumstances confronting them.

21  *See Berube*, 506 F.3d at 85.  Thus, Officers Smith and Wortman did not violate Mr.

22  Dasho's Fourth Amendment rights.

1          *c.  Clearly established law*

2          Furthermore, even if Officers Smith and Wortman's actions did constitute

3   excessive force, they are nevertheless entitled to qualified immunity.  At the second stage

4   of the qualified immunity analysis, Mr. Dasho bears the burden to demonstrate that the

5   right allegedly violated was clearly established at the time of the shooting.  *See Green*,

6   751 F.3d at 1051-52.  "A Government official's conduct violates clearly established law

7   when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently

8   clear' that every 'reasonable official would have understood that what he is doing

9   violates that right.'"  *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson*, 483 U.S. at 640)

10  (alterations in original).   Mr. Dasho need not provide a case "directly on point," but he

11  must show that existing precedent has "placed the . . . constitutional question beyond

12  debate."  *Id.* (citing *Anderson*, 483 U.S. at 640; *Malley*, 475 U.S. at 341); *see also id.* at

13  1084 ("We have repeatedly told courts . . . not to define clearly established law at a high

14  level of generality.  The general proposition, for example, that an unreasonable search or

15  seizure violates the Fourth Amendment is of little help in determining whether the

16  violative nature of particular conduct is clearly established." (internal citations omitted)).

17  Mr. Dasho has not carried his burden.

18          Mr. Dasho asserts that as of August 9, 2009, the law was clear that "the continued

19  application of force to an arrestee of civilian [sic] following the legal application of force

20  to stop a deadly threat can constitute excessive force."  (Resp. at 5.) That statement,

21  although true, is insufficient to satisfy Mr. Dasho's burden.  The notion that some

22  applications of force "can constitute excessive force" does not demonstrate that the

1   particular application of force here did in fact amount to excessive force under clearly

2   established law.  *See al-Kidd*, 131 S. Ct. at 1084.

3          Nor do any of the cases to which Mr. Dasho cites show that pre-August 9, 2009,

4   precedent had placed the lawfulness of Officers Smith and Wortman's conduct beyond

5   debate.  For example, Mr. Dasho relies on *Hopkins v. Andaya*, 958 F.2d 881 (9th Cir.

6   1992), and *Tubar v. Clift*, 286 F. App'x 348 (9th Cir. 2008).  In both of those cases,

7   however, the facts taken in the light most favorable to the plaintiffs showed that although

8   deadly force may have been justified at first, there was a pause in the events (and the

9   shooting) after which no one was in immediate danger and therefore the defendant-

10  officers' further use of deadly force was unreasonable.  *See Hopkins*, 958 F.3d at 886-87

11  (finding potentially unreasonable a second set of shots after the officer had wounded,

12  disarmed, and broken away from the suspect, crossed a street, reloaded, called for

13  backup, and placed a car between himself and the suspect); *Tubar*, 286 F. App'x at 351

14  (approving district court's denial of officer's motion for summary judgment); *Tubar v.*

15  *Clift*, 453 F. Supp. 2d 1252, 1253, 1257 (W.D. Wash. 2006) (describing plaintiff's

16  evidence as showing that the officer "paused, aimed, and fired" a third shot through the

17  driver's side window after plaintiff's vehicle was moving slowly away from the officer).

18  Here, however, there is no evidence of a pause in the events or the shooting after which

19  //

20  //

21  //

22  //

ORDER- 22

1   the Officers could reasonably have perceived that no one in the apartment was still in

2   immediate danger from Mr. Dasho.[4]

3       Mr. Dasho's citation to *Glenn v. Washington County*, 673 F.3d 864 (9th Cir.

4   2011), likewise fails to show that the Officers violated clearly established law.  In *Glenn*,

5   the officers responded to a report of a young man who was holding a pocket knife on

6   himself.  673 F.3d at 867.  When the officers arrived, the young man was not moving or

7   behaving in a threatening manner toward anyone.  *Id.* at 867-68.  The officers were able

8   to get everyone else away from the young man and had ample time and space within

9   which to pursue other options.  *See id.* at 868-69, 872-78.  Instead, they chose to shoot

10  him with a beanbag gun and, when that prompted him to move, with their firearms.  *Id.* at

11  869.  In light of this evidence, the court determined that a jury could find that the

12  officers' use of force was unreasonable.  *See id.* at 872-79.

13      The facts of the present case are markedly different.  Mr. Dasho was behaving in a

14  manner that was threatening not just to himself but also to the Officers and to Ms. Breen

15  and Jared.  *See Dasho*, 171 Wash. App. at *1; (Wortman Decl. ¶ 5; Wortman Report at 2;

16  Smith Decl. ¶ 5; Smith Report at 2; Breen Dep. at 51:18-54:23.)  Furthermore, events

17  unfolded precipitously and in tight space, giving the Officers little time in which to

18

---

19      [4] *Brockington v. Boykins*, 637 F.3d 503 (4th Cir. 2011), which Mr. Dasho also cites, is
    similarly unsupportive of his position.  There, the record viewed in the plaintiff's favor showed
20  the following:  that the officer shot the plaintiff several times, after which the plaintiff fell to the
    ground unarmed and incapacitated; that there was then a "clear break in events"; and that the
21  officer then proceeded to stand over the plaintiff and shoot him six more times "execution style."
    *Id.* at 507.  As discussed above, there is no evidence here from which a jury could reasonably
22  conclude that there was a clear break in events during the shooting or that following such a break
    the Officers stood over Mr. Dasho and shot him multiple times as he lay on the floor.

ORDER- 23

1  evaluate the situation and determine the appropriate reaction.  *See Dasho*, 171 Wash.

2  App. *1; (Noedel Report at 6, 8; Breen Dep. at 49:11-20; Wortman Report at 2; Smith

3  Report at 2.)  Accordingly, *Glenn* does not demonstrate that the Officers' conduct in

4  shooting Mr. Dasho violated clearly established law.

5        Thus, Mr. Dasho has failed to carry his burden to show that Officers Smith and

6  Wortman violated clearly established law.  *See Green*, 751 F.3d at 1051-52.

7  Furthermore, in light of cases such as *Berube*, 506 F.3d 79 (1st Cir. 2005), *Blanford*, 406

8  F.3d 1110 (9th Cir. 2005), and *Reynolds*, 84 F.3d 1162 (9th Cir. 1996), the court finds

9  that the Officers did not violate clearly established law when they shot Mr. Dasho.  For

10  these reasons, and because the court also finds that Officers Smith and Wortman did not

11  use excessive force against Mr. Dasho, Officers Smith and Wortman are entitled to

12  qualified immunity for shooting Mr. Dasho.  The court therefore grants Defendants'

13  motion for summary judgment on Mr. Dasho's § 1983 excessive force claims concerning

14  the shooting and dismisses those claims with prejudice.

15        2.  <u>Prompt Medical Care</u>

16        Mr. Dasho contends that Officers Smith and Wortman also used excessive force

17  by failing to promptly provide him with medical treatment after the shooting stopped.

18  (Resp. at 9-10.)  It is undisputed that the Officers did not personally administer aid to Mr.

19  Dasho but that they promptly radioed for help.  (*See* Staskiewicz Report at 15; Wortman

20  Report at 2-3; Smith Report at 2-3.)  It is also undisputed that medical help arrived in

21  under four minutes in response to that call.  (*See* Staskiewicz Report at 15.)  Mr. Dasho

22  nevertheless takes issue with the Officers' conduct because, he argues, it would have

ORDER- 24

1    been safe for them to personally administer aid to him right away.  (*See* Resp. at 10.)

2    Because they only called for help, Mr. Dasho believes the Officers violated his

3    constitutional rights.  (*See id.*)

4        Officers Smith and Wortman respond that they are entitled to qualified immunity

5    because their conduct with respect to providing medical aid did not violate Mr. Dasho's

6    clearly established constitutional rights.  (*See* Mot. at 15-17.)  The court agrees.

7    Although the Fourth Amendment requires the provision of medical care to persons who

8    have been injured during an arrest, the police may satisfy that obligation by "promptly

9    summon[ing] the necessary medical assistance."  *Tatum v. City & Cnty. of San*

10   *Francisco*, 441 F.3d 1090, 1098-99 (9th Cir. 2006) (citing *Graham*, 490 U.S. at 395; *City*

11   *of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Maddox v. City of L.A.*, 792

12   F.2d 1408, 1415 (9th Cir. 1986)); *see also id.* at 1099 ("[T]he critical inquiry is not

13   whether the officers did all they could have done, but whether they did all that the Fourth

14   Amendment requires.  Here, the officers promptly requested medical assistance, and the

15   Constitution requires them to do no more.").  As it is undisputed that Officers Smith and

16   Wortman promptly summoned medical care, Mr. Dasho cannot maintain his claim based

17   on the denial of medical care. *See Tatum*, 441 F.3d at 1098-99.  Thus, the court grants

18   Defendants' motion insofar as it concerns Mr. Dasho's § 1983 claim for denial of

19   medical care and dismisses that claim with prejudice.

20   **D.   Municipal Liability**

21       Mr. Dasho's complaint also alleges that Federal Way violated his constitutional

22   rights by ratifying the Officers' conduct and through its own policies and customs.  (*See*

1   Compl. ¶¶ 4.13, 6.2 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).)

2   Defendants attack those claims on the ground that Mr. Dasho has no evidence to support

3   them.  (*See* Mot. at 20-24.)  Mr. Dasho concedes this point in his response and requests

4   that the court dismiss his claims against Federal Way.  (*See* Resp. at 1.)  The court finds

5   that Defendants have met their burden of showing that there is no genuine issue of

6   material fact and that they are entitled to judgment as a matter of law on the claims

7   against Federal Way.  Accordingly, the court grants summary judgment on and dismisses

8   the claims against Federal Way with prejudice.

9   ### IV.    CONCLUSION

10      For the foregoing reasons, the court GRANTS Defendants' motion for summary

11  judgment (Dkt. # 44), STRIKES as moot Defendants' motions in limine (Dkt. # 66), and

12  DISMISSES this case with prejudice.

13      Dated this 17th day of June, 2015.

14

15

16  _____

17  JAMES L. ROBART
    United States District Judge

18

19

20

21

22